# IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
# DIVISION OF ST. CROIX

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | ) |
| | ) |
| | ) CRIM. NO.: 11-cr-09 |
| v. | ) |
| | ) |
| **DAMION BARRETT, RASHEED DAVID** | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

## MEMORANDUM OPINION AND ORDER

FINCH, Senior Judge

THIS MATTER is before the Court on the motion of defendant Damion Barrett ("Barrett") to suppress cocaine seized from his person and statements made when he was detained at the Henry E. Rohlsen airport in St. Croix. Barrett contends that the customs inspector at the airport lacked probable cause or reasonable suspicion to detain him and conduct a search, and thus, he argues, the evidence was seized in violation of his Fourth and Fifth Amendment rights. Defendant Rasheed David ("David") was also seized at the airport and seeks to suppress any cocaine recovered from his clothing or the airport restroom and any statements he made after being detained for questioning. David argues that the seizure and arrest of defendant lacked any legal justification. A hearing was held on this matter on July 11, 2011. Following the hearing, the parties filed written arguments. The Court, having considered both the testimony at the hearing and the legal arguments of the parties, finds that the defendants' constitutional rights were not violated and will thus deny defendant Barrett's and David's motions to suppress.

**I. Facts**

On March 29, 2011, defendants Damion Barrett and Rasheed David were scheduled to fly from Henry E. Rohlsen airport in St. Croix to San Juan, Puerto Rico on Cape Air flight 1258 at 12:25 p.m. At approximately 11:00 a.m., Barrett presented himself for inspection at the primary clearance booth in customs.[1] Customs inspector Vernon McSween conducted the interview of Barrett. McSween examined Barrett's boarding pass, photo identification and customs declaration form. McSween also asked Barrett several questions. He asked Barrett where he was traveling to, where he worked, what the purpose of his trip to St. Croix was and where he had stayed during his visit. He also asked Barrett if he had anything to declare. Barrett informed McSween that he was traveling to San Juan, Puerto Rico and then on to Orlando, Florida, where he resided, that he worked for Jet Blue airlines, that he had come to St. Croix for vacation on his two days off from work, that he wasn't sure of the exact location of where he had stayed, but that he was traveling with a friend and had stayed at his friend's grandmother's house. Barrett had nothing to declare. McSween testified that he asked Barrett to proceed to secondary inspection because Barrett appeared nervous, avoided eye contact and was stuttering, had stayed in St. Croix for a short duration and was uncertain about where he had stayed.

Secondary inspection was located a few feet away from the primary inspection area.[2] During the secondary inspection, also conducted by inspector McSween, Barrett's baggage was X-Rayed and subjected to a manual search. During the manual search, McSween continued to

---

[1] McSween explained that the primary clearance booth is an entry port to the United States where U.S. Customs and Border Protection examine individuals for immigration status, and also ask them whether they have any items to declare, *i.e.,* items that they are bringing into the United States.
[2] McSween explained that during secondary inspection, the customs inspector carries out a more in-depth conversation with the traveler and can inspect baggage.

2

interview Barrett, asking additional questions about where he was from, his family and his travel. Barrett revealed that he had come to St. Croix with Rasheed David, but stated that he was not traveling with David on that day. McSween noticed that Barrett seemed nervous and uncomfortable during this conversation. However, no evidence of illegal activity was uncovered in the baggage.

When the baggage screening concluded, McSween asked Barrett to empty his pockets. Barrett was wearing a loose-fitting long shirt over a T-shirt and close-fitting jeans. Barrett reached into his pockets, lifting a portion of the long shirt, and removed his wallet and cell phone. McSween testified that when Barrett had lifted his shirt to remove the contents of his pockets, he had observed an unusual mass in the groin area. In order to investigate further, McSween sought approval from his supervisor to conduct a pat-down of Barrett. He explained that Barrett had made a short trip to the Virgin Islands, was stuttering and avoiding eye contact and had a mass in the groin area. The pat-down was approved and Barrett was given brochures explaining the procedure and taken to a search room. A witness officer came with McSween and Barrett to the search room. According to Barrett, en route to the search room, Barrett's left arm was forcibly placed behind his back.

In the search room, Barrett was told to remove his shoes and his outer shirt. Barrett put his hands up against the wall and spread his legs, and was then patted down. In examining the buttocks area of Barrett, McSween detected a foreign object, a thick oval mass that did not feel like a body part. McSween asked if there was anything in the buttocks area and Barrett said no. McSween told Barrett to take his pants down and then reached into Barrett's underwear and removed the oval-shaped mass. Barrett was then restrained and placed in hand cuffs. McSween continued the search and removed 3 other oval-shaped objects from Barrett's groin area. The

3

objects were oval shaped masses of a white substance wrapped in saran wrap. A field test was conducted which confirmed that the substance was cocaine. Barrett was subsequently placed in a holding cell and required to put on prison attire. Barrett was not advised of his rights at this time.[3]

Next, McSween contacted the Passenger Analysis Unit ("PAU") to determine whether anyone was traveling with Barrett.[4] PAU determined that Barrett was traveling with Rasheed David and that David had already been processed and was seated in the sterile waiting area of the airport. David was then brought back to the secondary inspection area. His luggage was manually searched but no contraband was recovered. McSween also did a full body pat down of David, including a strip search and a cavity search of his buttocks area, with negative results. After the search was completed, David was escorted to a holding cell, where he spent approximately 45 minutes.

At some point after the discovery of cocaine on Barrett, a narcotic sweep of the waiting area and restrooms was conducted by Glenn Rogers, a canine enforcement officer for the United States Customs and Border Protection and his narcotic detection canine.[5] Rogers was

---

[3] Barrett stated that after drugs were discovered on him, they asked him how much money he was supposed to get for transporting it. However, there was no testimony that Barrett answered the question. Barrett also stated that while he was in handcuffs and seated in the secondary area, he was asked questions and answered because he felt like he had no choice; however, he did not indicate what questions were asked or what answers he gave.

[4] McSween explained that the Passenger Analysis unit provides information on whether a passenger is traveling with someone, who purchased the tickets, and when the tickets were purchased. Under cross examination he stated that the PAU determined that they were on the same "itinerary", that is, they were on the same Cape Air flight to Puerto Rico. The Cape Air flight usually carries 9 passengers.

[5] Rogers testified that the search occurred between 11:00 a.m. and 12:00 p.m.; the Court infers that it probably occurred between 11:15-11:45 a.m. because Rogers was told to do the search because an individual who was found with cocaine was traveling with another individual who had passed through customs. Thus, the search had to occur after the strip search of Barrett. Moreover, as indicated below, at 11:45 a.m., ICE Agent Adeen received information that cocaine was found on Barrett and in the airport restroom.

accompanied by two other officers, Meyers and Baldwin. Rogers began by searching the men's restroom where he discovered bricks of cocaine in one trash bin and two white oval shaped objects wrapped in clear plastic in another bin. The contents of the trash bin were taken to secondary inspection and the presence of cocaine was detected. Later, when Rogers conducted a dog sniff of David's clothing, the dog alerted positive to the odor of narcotics on the clothing. Because Rogers' dog was trained to bite and scratch upon detecting an odor of narcotics, David was not wearing the clothing during the canine sniff.

At 11:45 a.m., Special Agent Yusuf Adeen of ICE, was called and informed that an individual who had cocaine on his person had been detained at the airport. Adeen reported to the airport along with special agents Dennis Carter, Christopher McGrath, and task force officer Edgardo Jorge. The agents spoke with the CBP officers involved in the seizure of cocaine and were informed of the following: Damion Barrett had been found with approximately 1 kilogram of cocaine on his person; Barrett's traveling companion Rasheed David had been searched but no cocaine had been found on his person; and cocaine was found in the men's bathroom of the sterile waiting area.

At approximately 12:30 p.m., Adeen and Carter interviewed David in a small interview room at the airport. They indicated that they wanted to talk to David about the cocaine in the bathroom and the purpose for his visit to St. Croix. They informed David of his rights, by reading aloud to him a special rights form and also had David read the form. The form included a waiver of rights statement. David indicated in writing and orally that he waived his rights. (Gov't Ex. 3.) David told them he had known Barrett for about two years and that he and Barrett worked for Jet Blue airlines. He also stated that he had traveled to St. Croix with Barrett on two or three occasions. Usually, when the two traveled to St. Croix, Barrett would stay with David at

David's grandmother's house. At that point, David stated that he would like an attorney and the questioning ceased.

At approximately 1:14 p.m., Adeen and Carter interviewed Barrett. Prior to the interview, Adeen read Barrett the statement of his rights including the portion pertaining to a waiver of those rights. Barrett signed the waiver and verbally agreed to waive his rights. (Gov't. Ex. 4.) Barrett told the agents that he worked for Jet Blue as a customer service representative. He stated that he had traveled to St. Croix with David and that he had stayed at David's grandmother's house. He also stated that David had proposed the trip in order to smuggle cocaine from St. Croix to Orlando, Florida and that David had provided him with the cocaine and promised to pay him $3000 for his part in transporting the cocaine. David advised Barrett to keep the cocaine on his person and advised him that once he passed TSA, he would be okay. According to Barrett, David was also traveling with cocaine, but Barrett did not know how much. The interview lasted about two hours.

Barrett testified that he signed the waiver of rights because the agents had told him "it wasn't going to be nice." Barrett stated that Adeen got agitated when Barrett did not answer "how he wanted" and that at some points, Barrett declined to respond to Adeen but Adeen kept asking questions. Notwithstanding Barrett's fear of the predicament he found himself in, he conceded that he was not threatened or coerced by Adeen or his partner, that no firearms were drawn, and that he was provided with water and allowed to use the bathroom.

## II. Discussion

### A. Fourth Amendment

The Fourth Amendment protects citizens from unreasonable searches and seizure. "What is reasonable depends upon all of the circumstances surrounding the search or seizure and the

6

nature of the search or seizure itself." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985) (citing *New Jersey v. T.L.O*., 469 U.S. 325, 337-342 (1985). "The permissibility of a particular law enforcement practice is judged by 'balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'" *Id*. (quoting *United States v. Villamonte-Marquez*, 462 U.S. 579, 588 (1983)). At the international border, "the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is . . . struck much more favorably to the Government." *Id.* at 539-40; *see also United States v. Flores-Montano*, 541 U.S. 149, 152-53 (2004) ("Time and again, we have stated that 'searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border'" (quoting *United States v. Ramsey*, 431 U.S. 606, 616 (1977))).[6] "Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant." *Montoya de Hernandez*, 473 U.S. at 538. On the other hand, "certain searches, classified as 'nonroutine,' require reasonable suspicion of wrongdoing to pass constitutional muster." *United States v. Whitted*, 541 F.3d 480, 485 (3d Cir. 2008) (internal quotations and citations omitted); *see also Bradley v. United States*, 299 F.3d 197, 203 (3d Cir. 2002) (collecting cases).

Routine searches are distinguished from the non-routine by considering the significance of the privacy invasion and the level of intrusiveness and indignity attached to the search. *Whitted*, 541 F.3d at 485. Patdowns, frisks and luggage searches are all examples of routine searches that,

---

[6] The rationale for permitting greater government intrusion at the border is based on Congress' broad powers to "to regulate Commerce with foreign Nations." *Montoya de Hernandez*, 473 U.S. at 538 (citing U.S. Const. Art. I, § 8, cl. 3). This power allows Congress to regulate the collection of duties, to prevent the introduction of contraband and to stop and examine persons entering the country. *Id*. at 538-39.)

7

at the border, the government may carry out at its discretion. *Id.* at 485-86. The quintessential examples of non-routine searches are strip and cavity searches. *Id.* ("body cavity searches, strip searches, and x-ray examinations are considered nonroutine by virtue of their significant intrusion on an individual's privacy").

The border search "exception applies not only at the physical boundaries of the United States, but also at the 'the functional equivalent' of a border." *Id*. at 485 (3d Cir.2008) (quoting *Almeida-Sanchez*, 413 U.S. 266, 272-73 (1973)). An international airport may be considered the functional equivalent of a border for Fourth Amendment purposes. *Almeida-Sanchez*, 413 U.S. at 273.

### 1. Whether Barrett's Fourth Amendment rights were violated

Barrett argues that he was seized in contravention of the Fourth Amendment when he was sent to secondary inspection by customs inspector McSween. Barrett's theory rests on the premise that the purpose of border inspection is to inspect aliens and that the government is prohibited from mandating secondary inspection of a United States citizen absent reasonable suspicion of criminal activity. Barrett further asserts that his initial interview with the customs inspector did not give rise to probable cause or reasonable suspicion, and that he was selected for secondary inspection because he was a black Rastafarian.

It is beyond dispute that St. Croix is a border for the purposes of Fourth Amendment analysis. *United States v. Hyde*, 37 F.3d 116, 122 (3d Cir. 1994)[7]; *see also David v. Government*

---

[7] As the Third Circuit explained:

> Congress has broad power to regulate commerce between the United States and its unincorporated territories, just as it has broad authority to regulate commerce with foreign nations. It has constitutionally exercised the former power to create a border for customs purposes between the Virgin Islands and the United States. Routine warrantless border searches without probable cause would appear to be as essential to the accomplishment of the objects of that

8

*of Virgin Islands*, 2009 WL 1872678, at *5 (D.V.I. 2009) (an international airport may be considered the functional equivalent of a border for Fourth Amendment purposes.) Thus, customs officials at Henry E. Rohlsen airport in St. Croix may conduct routine searches at their discretion, without reliance on reasonable suspicion or probable cause. This standard applies whether the individual at the border is an alien or a citizen; the border search is not simply a means of detecting inadmissible aliens but also enables the government to exclude illegal items from entering the country. *Flores-Montano*, 541 U.S. at 152 ("The Government's interest in preventing the entry of unwanted persons and *effects* is at its zenith at the international border.") (emphasis added); *Montoya de Hernandez*, 473 U.S. at 537 ("Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and *to prevent the introduction of contraband* into this country") (emphasis added).

In this case, Barrett was sent to secondary inspection where he was detained for further questioning and frisked. The questioning and the patdown that occurred in secondary can be characterized as routine for purposes of a border search. *Whitted*, 541 F.3d 485-86. Therefore, the actions were not prohibited by the Fourth Amendment. *Montoya de Hernandez*, 473 U.S. at 538.

After McSween detected the unusual mass in Barrett's groin area during the patdown, Barrett was subjected to a strip search, a search that involves a "significant intrusion on an individual's

---

        customs border as similar traditional searches have universally been recognized to be to the objectives of traditional customs systems at international borders. Thus, as far as the interests of the sovereign are concerned, we perceive the interest of the United States in warrantless searches without probable cause at this "internal" border to be little different from its interest in such searches at its international borders.

*Id.*

privacy" and one that is thus classified as non-routine. *Whitted*, 541 F.3d at 485-486. Such a search requires that the government have reasonable suspicion. *Id*. The Court finds that the customs inspector in this case did have reasonable suspicion to conduct this more intrusive search: McSween stated that Barrett, who had visited St. Croix for only two days and could not state where he had stayed during his visit, appeared nervous, stuttered, avoided eye contact, and was found with a large non-fleshy mass in his groin area. *See, e.g., United States v. Lamela Vazquez*, 719 F. Supp. 68, 69 (D.P.R. 1989) (customs agents had reasonable suspicion to justify a strip search where the defendant came from a drug source country, was nervous and had a bulky area at his waist, and a pat down revealed that the male defendant was wearing a girdle); *United States v. Nunez*, 19 F.3d 719, 724 (1st Cir. 1994) ("Nuñez's nervous behavior, the stiff manner in which he walked, the difficulty in bending, and the bulges underneath his clothing were sufficient to raise a reasonable suspicion in the minds of experienced law enforcement officers that Nuñez was carrying contraband"). The Court concludes that the seizure of the cocaine taped to Barrett's person did not violate his rights under the Fourth Amendment.[8]

---

[8] The Court briefly addresses the issue of Equal Protection raised in Barrett's brief. There was no evidence on the record that Barrett was selected for secondary inspection or was patted-down or searched because he was a black Rastafarian. The Court does not even have a record that the defendant is a Rastafarian. *See Bradley v. United States*, 299 F.3d 197, 205 (3d Cir. 2002) ("To make an equal protection claim in the profiling context, [defendant] was required to prove that the actions of customs officials (1) had a discriminatory effect and (2) were motivated by a discriminatory purpose."). To prove discriminatory effect, Barrett had to show that he is a member of a protected class and that he was treated differently from similarly situated individuals in an unprotected class. *Id*. at 205. In the absence of direct evidence Barrett was required to present evidence of similarly situated individuals of a different race/religious profile who were not searched. *Id*. at 206. There was no testimony regarding any of the above. Moreover, even if there were evidence that profiling of Barrett occurred, it is unlikely that it would require the Court to apply the exclusionary rule. *See, e.g, United States v. Nichols*, 512 F.3d 789, 794 (6th Cir. 2008), *overruled on other grounds* by *United States v. Buford*, 512 F.3d 789, 794 (6th Cir. 2011), (holding 42 U.S.C. § 1983 rather than suppression is the appropriate remedy for Equal Protections violations); *c.f., Hudson v. Michigan*, 547 U.S. 586, 591, 593-94 (2006) (noting that "exclusion may not be premised on the mere fact that a constitutional violation was a "but-for" cause of obtaining evidence" and refusing to apply it to a knock and announce violation because the knock and announce requirement protected different interests than the warrant rule and thus required a different remedy). In any case, the Court reiterates that there was no evidence of racial and religious profiling of Barrett. All the evidence suggests that the customs officers acted on the basis of Barrett's conduct and not on the basis of racial or religious animosity.

### 2. Whether David's Fourth Amendment rights were violated

David contends that the government violated his Fourth Amendment rights when customs officials subjected him to a strip and cavity search without reasonable suspicion. Thus, he asks the Court to suppress all evidence obtained as a result of the search of his person, as well as the canine search of the men's restroom and the canine sniff of his clothing. On the basis of the alleged Fourth Amendment violation, he also asks the Court to suppress statements he made when he was detained and questioned at the airport.

The Court recognizes that a strip search is a "non-routine" search, and thus, when conducted at the border, requires reasonable suspicion to justify. *Whitted*, 541 F.3d at 485-86. However, the Court finds that there was reasonable suspicion to support the search of David. The Court also finds, for the reasons stated below, that David is without standing to contest the canine search of the men's bathroom at the airport.

In this case, suspicion that David was engaged in criminal conduct arose as a result of McSween's investigation of Barrett. As the Court of Appeals held in *United States v. Gil de Avila*, "evidence relating to the companions of the subject of the strip search can be considered in determining when such a search may be justified." 468 F.2d 184, 187 (9th Cir. 1972). Officer McSween testified that Barrett was found with four plastic bags of cocaine taped to his person, and a subsequent analysis of the passenger list for the Cape Air flight revealed that Barrett was traveling with David. Moreover, Barrett indicated that he did not know anyone else in St. Croix but David, had traveled with David to St. Croix and stayed at his grandmother's house, but denied that he was traveling with David to Puerto Rico, although there was evidence to the contrary. Applying the totality of the circumstances analysis to these facts, the Court finds that there was reasonable suspicion to search David. *See, e.g.*, *United States v. Garcia*, 848 F.2d 58,

61 (4th Cir. 1988) (where DEA agents found quantity of cocaine was sufficiently large to indicate an intent to distribute on defendant's traveling companion, and where the two men were together after disembarking from an airplane and engaged in suspicious conduct indicating that they did not wish to be seen together, there was probable cause to arrest defendant); *Gil de Avila,* 468 F.2d at 187 (where traveling companions in a vehicle traveling from Mexico to the United States were visibly nervous and had needle tracks on their arms, there was reasonable suspicion to justify a strip search of defendant); *United States v. Wilson*, 488 F.2d 400, 402 (5th Cir. 1973) (finding reasonable suspicion to submit defendant to a strip search at the border where a marijuana seed had been found in her traveling companion's suitcase). Moreover, given the fact that Barrett had secreted the cocaine on his person, it was reasonable to investigate the same area of David's body. *United States v. Diaz*, 503 F.2d 1025, 1026-27 (3d Cir. 1974) (a strip search meets the reasonableness standard of the Fourth Amendment when there are objective, articulable facts that that would reasonably lead a customs official to suspect that the individual seeking to cross the border is concealing something on his body).

The Court also finds that the dog sniff of David's clothing was legitimate. First, the Court notes that a dog sniff does not require probable cause or reasonable suspicion. *United States v. Caraballo*, 2004 WL 1659786, at *2 (3d Cir. July 26, 2004) ("A dog sniff is not a search and no probable cause or reasonable suspicion is necessary to conduct it, because it is minimally intrusive and neither requires entry nor subjects any items except contraband to police scrutiny") (citing *United States v. Place*, 462 U.S. 696, 707-08 (1983)). In any case, at this point in time, there was reasonable suspicion, if any were needed, to conduct a canine sniff of David's clothing. In addition to the facts recited above that linked David to Barrett, oval packages of cocaine had been found in the men's bathroom in the airport's sterile waiting area, packages

similar to those found on Barrett's person. David, having passed through the customs inspection area, had access to that area. Moreover, given the fact that his traveling partner did not appear in the waiting room, David would have good cause to remove any drugs from his person. *See, e.g., United States v. Lamela*, 942 F.2d 100, 102 (1st Cir. 1991) (where defendant's traveling companion was discovered with cocaine on his person by a customs official, and cocaine was found deposited in a trash bin in the public restroom, there was reasonable suspicion to search the defendant).

David's contention that the cocaine was illegally seized from the men's bathroom is without merit. The cocaine was not seized from David because at the time it was recovered, it was not in his possession. *See Government of Virgin Islands v. Olinsky*, 2005 WL 78554, at *2 (3d Cir. Jan. 14, 2005) (citing in *California v. Hodari D.*, 499 U.S. 621, 629 (1991)) (because defendant abandoned the firearm before he was seized by the police, the police's recovery of the firearm did not constitute a seizure of the weapon and the Fourth Amendment was not implicated).

In sum, the Court concludes that there was no violation of David's Fourth Amendment rights. Thus, the fruit of the poisonous tree doctrine, which provides for suppression of all evidence obtained as a result of an illegal search, is inapplicable.

### B. Fifth Amendment

Barrett seeks to suppress statements he made to government agents when detained at the airport on the basis that he did not provide the statements voluntarily but was tricked into making them by the illegal conduct of the government.

"The Fifth Amendment of the United States Constitution provides that no person 'shall be compelled in any criminal case to be a witness against himself.'" *Colorado v. Spring*, 479 U.S. 564, 572, (1987). The privilege "is fully applicable during a period of custodial

interrogation." *Id*. (quoting *Miranda v. Arizona*, 384 U.S. 436, 460 (1966)). Generally, prior to questioning a suspect in custody, law enforcement officers must provide appropriate warnings and notifications of rights. *Miranda*, 384 U.S. at 444-45. A statement obtained as a result of unwarned custodial interrogation is barred from use at trial by the exclusionary rule. *United States v. DeSumma*, 272 F.3d 176, 179-80 (3d Cir. 2001). A person is in custody when circumstances indicate that "a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Interrogation occurs when there is express questioning or its functional equivalent, that is, where law enforcement should know that their words or actions are reasonably likely to elicit an incriminating response. *Rhode Island v. Innis,* 446 U.S. 291, 300-01 (1980).

As previously determined, in this case, the questioning of Barrett occurred at the border. At the border, customs officers' questioning of an entrant to determine whether the person or his effects is admissible is not subject to the requirements of Miranda. *United States v. St. Vallier*, 2010 WL 5176853, at *4 (3d Cir. Dec. 22, 2010) (citing *United States v. Kiam*, 432 F.3d 524, 529–30 (3d Cir.2006) ("normal Miranda rules are . . . inapplicable to circumstances where border inspectors question persons seeking entry into the United States"). Moreover, "whether an individual is questioned in a primary inspection line or removed from the line for secondary inspection has no bearing on the inapplicability of normal Miranda rules under such circumstances." *Id*. (citing *Kiam*, 432 F.3d at 530). For purposes of Miranda, there is "no material distinction between questioning an alien to determine whether he is entitled to enter the country and questioning a U.S. Citizen to determine whether his effects are entitled to enter the country." *Id*. n. 4. Thus, "custody is not dispositive in the context of border questioning." *Id*. (citing *Kiam*, 432 F.3d at 529).

That is not to say that an entrant at the border can never invoke Miranda. When an "inspector's questions objectively cease to have a bearing on the grounds for admissibility and instead only further a potential criminal prosecution" then the inspector is requried to administer Miranda warnings. *Kiam*, 432 F.3d at 530. On the other hand, the subjective suspicion of the officer is not sufficient to trigger the requirement to Mirandize the suspect. As the Third Circuit has explained,

> [D]eterminations regarding the admissibility of persons or importation of effects often involve an initial assessment of whether a person is engaged in criminal activity. A criminal offense, such as illegal reentry, may be inextricably tied to a person's admissibility, yet customs officers are not required to provide Miranda warnings prior to asking questions that might bear upon this illegal conduct. The same is true when an officer may suspect that an individual or that individual's effects must be interdicted because of a presently occurring effort or ongoing conspiracy to smuggle drugs across the international border. Accordingly, suspicion of criminal conduct does not overrule the simultaneous responsibility of immigration or customs agents to inspect entrants at our borders. Similarly, questions that bear upon both admissibility and criminal conduct, while not relating solely to prosecution of the latter, do not cross the boundary we articulated in Kiam.

*St. Vallier*, 2010 WL 5176853, at *5 (citations and internal quotations omitted).

Barrett was questioned at several points while detained at the airport: by customs officers while in primary and secondary inspection, and by ICE officers following the discovery of drugs. It is not in dispute that he was in custody while questioned, and that he was not Mirandized until drugs were found on his body. However, as the Third Circuit has made clear, this fact is not dispositive for purposes of Miranda as long as those questions were geared toward determining the admissibility of Barrett or his effects. Also, as noted above, it is immaterial that Barrett was detained for further questioning at secondary inspection or that he is a United States citizen. The

Court finds that all the questions asked by McSween up until the point where he discovered drugs on Barrett's person were permissible in that McSween's questions were a means of determining whether Barrett or his effects were admissible and did not relate solely to criminal prosecution for drug offenses. Because Barrett did not have the right to remain silent during this questioning, his argument that he was tricked and did not speak voluntarily is of no avail.

Once Barrett was discovered with cocaine taped to his body, he was detained until ICE officials arrived. ICE Officer Adeen testified that he read Barrett his rights and that Barrett signed a document acknowledging that he had been warned and that he had waived his right to remain silent.

A person can waive his Miranda rights "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444. To determine validity, the Court asks two questions: (1) whether the waiver was voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception" and (2) whether the waiver was "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Velasquez*, 885 F.2d 1076, 1084 (3d Cir.1989) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

There are no facts in the record that indicate that Barrett was coerced or deceived into talking to the ICE agents, and implicating himself and David in drug trafficking, or that he was not fully aware of the rights he was ceding. While Barrett stated that Adeen got agitated when Barrett did not answer "how he wanted," Barrett conceded that he was not threatened or coerced by Adeen or his partner, that no firearms were drawn, and that he was provided with water and allowed to use the bathroom.

Barrett also had the intellectual capacity to understand the rights he was waiving. He is a mature adult of 37 years of age, and prior to this incident, worked for Jet Blue in ground operations. He has a high school diploma and received a degree in culinary arts and mixology. Barrett did not contend that he misunderstood the consequences of speaking freely to the law enforcement officials. Nor is there any evidence from which the Court can infer that he did not knowingly waive his rights to speak the ICE agents. *See, e.g., United States v. Velasquez*, 885 F.2d 1076, 1087 (3d Cir. 1989) (finding knowing and voluntary waiver where defendant was a mature forty-three–year-old adult college-graduate, and though foreign-born, had lived in the United States for at least 15 years and was able to speak and understand English, and had worked in Miami as a cosmetologist); *United States. v. Richardson*, 2008 WL 410120, *3 (3d Cir. Feb. 15, 2008) (finding that defendant, even though he had a low IQ, learning disabilities, and attended special education classes, had "the requisite level of comprehension to understand his waiver" where defendant was a 37–year–old high school graduate who had held a number of jobs, and had significant knowledge of computers as well as some familiarity with the criminal justice system).

**III. Conclusion**

For the foregoing reasons, the Court finds that Rasheed David's Fourth Amendment right to be free from unreasonable searches and seizures was not violated when he was detained at the Henry E. Rohlsen Airport in St. Croix. Therefore, neither the cocaine obtained nor the statements he gave to ICE Agent Adeen is inadmissible. With respect to Damion Barrett, the Court also finds that the search and questioning of Barrett were proper and in compliance with

the Fourth and Fifth Amendments. Thus, the contraband seized from his person and any statements he made while detained at the airport are also free from taint and admissible.

Accordingly, it is hereby ORDERED that Rasheed David's motion to suppress is DENIED; it is further ORDERED that Damion Barrett's motion to suppress is also DENIED.

ENTER:

Dated: September 22, 2011

_____/s/_____
RAYMOND L. FINCH
SENIOR U.S. DISTRICT JUDGE